183 So. 424

### BELL et al. v. MOSS et al.

6 Div. 802.

Supreme Court of Alabama.

June 9, 1938.

Rehearing Denied Oct. 6, 1938.

Mullins, Deramus & Stuart, of Birmingham, for appellants.

Benners, Burr, McKamy & Forman, of Birmingham, for appellees.

KNIGHT, Justice.

From a decree dismissing their cross bill, the cross complainants prosecute this appeal. The final decree was rendered on December 7th, 1934, and the appeal was submitted here on April 13th, 1938. The record is voluminous, consisting of more than eight hundred pages.

The case was once before in this Court, on appeal from a decree sustaining demurrers to the cross bill, and dismissing the same. The precise ground of demurrer upon which the lower court acted, in rendering the first decree, was that the matters attempted to be set up and litigated in the cross bill were not germane to the original bill. On former appeal, we reversed this decree, and held that the matters set up and attempted to be litigated in the cross bill were germane to the original bill, and that the lower court committed error in sustaining the demurrer taking this point.

For a full and comprehensive statement of the averments of the original, as well as the cross bills, we refer to the report of this case in Denicke v. Davitt, 223 Ala. 69, 134 So. 794. The cross bill, as observed on the former appeal, "charges an equitable trust," arising from a transaction procured by fraud, and undue influence exerted by C. L. Moss, the son, upon his father, L. K. Moss.

After the remandment of the cause, Mrs. Thornton, a sister of the respondent C. L. Moss, and one of the cross respondents, withdrew from the cross bill; and later, upon his arrival at the age of twenty-one years, the cross complainant Godfrey De-Giles Etter, a brother of the other two cross complainants, withdrew as such cross complainant. The cross bill was accordingly amended by making these two parties cross respondents.

With the cross bill so amended, it stood in the name of Cora Moss Bell and Jean Etter Denicke, individually, and as administratrix of the estate of Daisy M. Etter, deceased, and they are the only appellants here complaining of the decree.

The real question presented on this appeal is, was the transfer of the stock owned by L. K. Moss, deceased, the grandfather of appellants, to the appellee, C. L. Moss, procured by fraud and undue influence, thereby giving rise to an equitable trust in favor of the appellants, in the right of their deceased mother, against the said C. L. Moss, in the property so transferred.

It appears from the averments of the cross bill, and from the evidence, that the said L. K. Moss, then about the age of seventy years, transferred his capital stock, one hundred twenty-five shares (a fourth interest) in a corporation known as the Warrior Black Creek Coal Company, and his stock (seventy-five shares) in the Mabel Mining Company to his son, the said C. L. Moss, for a consideration actually paid of $50,000.00.

The evidence shows that this sale and transfer actually took place on September 24, 1919, and was evidenced by an agreement in writing, executed not only by L. K. Moss, the father, and the said C. L. Moss, but also by Mrs. G. D. Etter, the mother of cross complainants, Mrs. H. P. Thornton and Ida A. Davitt, the last three named signers being all the children of said L. K. Moss, except the said C. L. Moss, the purchaser.

By the terms of the said agreement, the consideration price of $50,000.00 was deposited with the Birmingham Trust & Savings Company, subject to the check of L. K. Moss of $500.00 per month during life, and with the further provision: "Upon the death of the party of the first part (L. K. Moss), the party of the fourth part (Birmingham Trust & Savings Co.), shall at once deliver to the parties of the third part, who are the daughters and son of the party of the first part, such portions of said Fifty Thousand Dollars, and investments made therefrom as it has on hand at such time and in equal division among them; and the parties of the third part agree to accept said division and to execute receipts therefor in full satisfaction of their claims and rights in and to said property."

The preamble to said agreement recited: "Whereas, the party of the first part owns capital stock in the Warrior Black Creek Coal Company, a corporation, and Mabel Mining Company, a corporation, and desires to retire from active business in connection with said corporation, and at the same time desires to secure the use of the value of said stock for himself during his life time, and at his death to divide the value of said stock then remaining among

the parties of the third part, (Who constitute all his children)."

It also appears from the evidence that the said C. L. Moss, at about the same time the above mentioned instrument was executed, entered into a written agreement with the said Ida A. Davitt, that in consideration of her agreement to take the said L. K. Moss into her home and care for and look after him, she should have his one-fourth part of what might remain of the trust fund so deposited with the Birmingham Trust & Savings Company, after the death of his said father, if any.

It further appears that this $50,000.00 was duly deposited by said C. L. Moss with the Birmingham Trust & Savings Company on September 24, 1919, and that each month thereafter during the life time of L. K. Moss, the father, the said L. K. Moss drew $500.00 from said fund and its accretions, and that upon his death, which occurred on July 3rd, 1922, there remained of this fund, and accretions, more than $36,-000.00, and the Birmingham Trust & Savings Company distributed to Mrs. G. D. Etter, the mother of these appellants, the sum of $9,956.92, according to the terms of the said agreement made on September 24, 1919. A like settlement was made with each of the other children of L. K. Moss, deceased, except Mrs. Davitt not only drew her own share, but also the share of her brother C. L. Moss. This double payment was made to Mrs. Davitt under the above mentioned agreement with her brother.

There is no evidence in this record, which we can credit, tending in the slightest way to show that L. K. Moss, the father, at any time expressed dissatisfaction with the sale to his son of said stock. Mrs. Davitt, it is true, testified to mailing some letters to her brother about the proposed sale, purportedly written or dictated, and signed by the father. However, we cannot bring ourselves to point of believing that any such letters were ever written or mailed to the said C. L. Moss, or to Birmingham Trust & Savings Company. It is certain that after these letters were said to have been written and mailed, the father each month, until his death, withdrew from the Birmingham Trust & Savings Company the $500.00, which, by the agreement, it was provided he should be paid. At no time did he complain that the stock had been procured from him by fraud, or undue influence.

The evidence does show that in April, 1919, the said L. K. Moss suffered a slight stroke of paralysis but the three physicians, who testified in the case, and who had known Mr. Moss for years, and had attended him after his stroke, each, testified that his mind had not been affected by the stroke, and that he was as clear and strong mentally as before the illness occurred.

Dr. W. M. Jordan, who was called to see Mr. Moss in May, 1919, while he was at St. Vincent's hospital, testified in substance: That he had known Mr. Moss for some years; that he was "a sweet mannered, noble character" and had a strong mentality, that in his conversations with Mr. Moss, after the stroke of paralysis, he saw nothing to indicate that he was mentally wrong; and that "he appeared to be mentally like he had always been."

Dr. H. S. Ward, a witness for the cross respondent C. L. Ward, testified that he had known Mr. L. K. Moss for several years; that he was called to see Mr. Moss when he suffered the stroke of paralysis; that "he had a mild stroke of the left side," but that being a right handed man, it did not interfere with his speech and general intelligence; that it did not affect the strength or quality of his mind, "seemed to be perfectly clear," and did not affect, so far as witness knew or observed, the strength of his will power; "seemed to be as clear mentally, and active, as he ever was."

Dr. James Alto Ward testified that he was called to see Mr. Moss on December 11, 1920, and that he saw him from one to three times a month until August, 1921, that he was then in good condition and did not have anything else to do for him until March 30, 1922, and after that date he saw him daily until his death, July 3, 1922. This witness further testified that Mr. Moss, during the time he saw him, and up to within a few weeks of his last illness, "was always mentally clear;" that from December 11, 1920, until March 22, 1922, "I would say his mental attitude was certainly as good or a little better than a man of his age on the average."

There was other testimony in the case tending to show that after the stroke of paralysis Mr. Moss went around attending to his business, and was mentally alert.

The evidence leaves no room for serious doubt that Mr. Moss fully understood the transaction had with his son, C. L. Moss,

and which is now under attack, and acquiesced therein, and spent a large part of the consideration paid him by his son, and with a knowledge of all the facts. The testimony wholly fails to show that the son at any time dominated the father, or withheld from him any information regarding the value of the stock, or the financial condition of the corporations. The evidence likewise wholly fails to satisfy us that the transfer of this stock was procured by fraud, or undue influence exerted by the son upon his father.

█ It may be true, as insisted by appellants, that the stock was worth more than the price paid, but inadequacy of price alone is not sufficient to invalidate the transaction, in the absence of any evidence which would show, or tend to show fraud or undue influence on the part of the son. Hawthorne v. Jenkins, 182 Ala. 255, 62 So. 505, Ann.Cas.1915D, 707; 2 Pom.Eq.Jur. (2d Ed.) § 962.

The rules of law applicable to cases like the present have often been stated by this Court, and are well understood.

In the case of Hassell et al. v. Hassell, 201 Ala. 190, 77 So. 716, this Court, in an opinion by the late Justice Somerville observed (page 717):

"The relation of parent and child is per se a confidential relation, but it is always presumed, prima facie, that in all transactions between them the parent is the dominant party, and that they are free from undue influence. (2) In such cases the burden is upon the complainant to overcome this presumption, and to reasonably satisfy the court that time and circumstances have reversed the order of nature, so that the dominion of the parent has not only ceased, but has been displaced by subservience to the child. (3) The law distinguishes the relation of parent and child, in so far as gifts or grants from the parent to the child are concerned, from other classes of confidential relations, and it revokes such benefits only where the exercise of actual undue influence is shown, and not merely because of a confidential relation and the absence of competent independent advice to the grantor. (4) Even where the dominance of the parent has presumptively ceased, the inquiry is whether, on all the evidence, it reasonably appears that the beneficial act proceeded from the free volition of the parent, without imposition or coercion on the part of the beneficiary. Hawthorne v. Jenkins, 182 Ala. 255, 62 So.

505, Ann.Cas.1915D, 707, and the numerous cases cited therein.

"It is to be noted also that in such cases the fact that the pecuniary consideration is inadequate, or even entirely absent, is not evidence of undue influence exerted upon the grantor; for 'gifts and benefits flow naturally from parent to child,' and 'every person who is sui juris, and under no legal disability, has an unquestionable right of disposition of his property, whether by gift or otherwise.' Hawthorne v. Jenkins, supra; McLeod v. McLeod, 145 Ala. 269, 40 So. 414, 117 Am.St.Rep. 41. And, as said by Mr. Pomeroy:

" 'Transactions between parent and child may proceed upon arrangements between them for the settlement of property or of their rights in property in which they are interested. In such cases courts of equity regard the transaction with favor. They do not minutely weigh the consideration on one side or the other.' 2 Pom.Eq.Jur. (2d Ed.) § 962.

."So, we have pointedly declared that when a grant or gift is in fact free from fraud or undue influence, 'it becomes immaterial what the consideration was.' Stroup v. Austin, 180 Ala. 240, 60 So. 879, 880. We, of course, do not mean to say that, when associated with evidence of actual undue influence, inadequacy of consideration may not be an important factor against the grantee upon that issue. But it merely aggravates and does not create that conclusion."

█ The evidence in this case wholly fails to satisfy us that the transaction, now under attack, was brought about by any fraud or fraudulent practices on the part of the son, C. L. Moss, or by any undue influence exerted by him. We do not find in the evidence anything that would warrant a reasonable conclusion that the son had any dominion over the father, on the contrary, we are reasonably satisfied that the father fully understood the transaction, that he entered into and consummated it of his free volition, without any sort of coercion or restraint on the part of any one.

Without doubt L. K. Moss, the father, throughout the years, had been most kind and generous to his daughters and son. He had given them most liberally of his means, and this fact stands out most prominently in the evidence, even in that given by the daughters.

C. L. Moss had worked long and faithfully in helping his father to accumulate the property. No doubt this fact, as well as the desire of the father to retire from business, was in the mind of the father when he entered into the contract of sale of his stock in the two companies. Mr. Moss knew he was then nearing seventy years of age, and that, due to the infirmities of his body, his expectancy could not be great. His wife was then dead; and his children were all married. The sale produced for him a reasonable competency for his remaining years. It is, therefore, reasonable to infer from the evidence that these considerations moved Mr. Moss to make the sale and transfer. At any and all events, it secured for him a competency for life, free from the hazards of the mining business.

Again, we find that the three daughters (one, the mother of cross complainants) fully understood the transaction, and gave their consent thereto, and to that end joined their father in the contract of sale.

Besides, the evidence shows, as above pointed out, that the mother of these cross complainants, upon the death of the father, claimed and received her distributive share of the proceeds of the sale, then remaining and not consumed by the father. This daughter, Mrs. Etter, lived seven years after the death of her father, and did not, during that time, take any steps to have the transfer of the stock set aside. This delay is qute persuasive that she fully acquiesced in, and ratified the transaction, if ratification were necessary.

The cross complainants stand in the shoes of their mother, and have no greater or better rights than their mother. If the mother were living, and making this attack on the transaction, we would be compelled to hold that under the evidence she would not be entitled to any relief. Her daughters, the two cross complainants, must, therefore, be denied relief.

The court, under the evidence, committed no reversible error in entering the three interlocutory decrees, refusing to require the named cross respondents to produce certain documents for inspection and evidence.

It only remains to be said that we are in full accord with the decree of the court below in dismissing the cross bill. The evidence, in the record, without invoking the presumption of correctness which

is due to be given the findings of fact by the chancellor, on oral testimony given before him, fully sustains the decree. Finding no errors in the record, the decree of the circuit court is due to be affirmed. It is so ordered.

Affirmed.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.